IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 MAR -3 AM 8: 51

U.S. DISTRICT COURT
N.D. OF ALABAMA

ALLISON AMISON ANDERSON,       )

    PLAINTIFF,       )

VS.       )       CV-03-H-0052-S

BLUE CROSS AND BLUE SHIELD       )
OF ALABAMA,

    DEFENDANT.       )

**ENTERED**

**MAR 0 3 2004**

## MEMORANDUM OF DECISION

The court has before it the December 3, 2003 motion of defendant Blue Cross and Blue Shield of Alabama ("BC/BS") for summary judgment.  Pursuant to the Court's December 4, 2003 order, the motion was deemed submitted, without oral argument, on January 5, 2004.

### I. Procedural History

Plaintiff Allison Amison Anderson commenced this action on January 9, 2003 by filing a complaint in this court alleging a violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act.[1]  While ¶ 3 of the Complaint alleges this court's jurisdiction under the Civil Rights Act of 1991 and 42 U.S.C. § 1981 et seq., there is no

---

[1] This charge is made in Count I of the complaint.  (See Compl. Count I.)  Specifically, this count alleges a "violation of Title VII . . . because [plaintiff] was pregnant."  (Id.)

count in the Complaint alleging race discrimination on the part of the employer, BC/BS.  Further, there is no claim of race discrimination contained in the charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC") filed on April 26, 2002.  (See Def.'s Ex. 1 to Dep. of Allison Anderson.)  Nevertheless, defendant BC/BS briefed the court on the Plaintiff's apparent claims of both pregnancy and race discrimination.[2]  (See Def.'s Brief in Support of Summ. J. ¶¶ 80-92; see also id. at 19-20.)  However, plaintiff's response to defendant's motion for summary judgment makes clear that Anderson's only claim of discrimination before this court is on the basis of pregnancy discrimination.[3]  Therefore, based on this fact, combined with the fact that there exists only one count in the complaint alleging pregnancy discrimination (see Compl. Count I), the court will consider pregnancy discrimination as the only claim in this case.  Defendant's December 3, 2003 motion for summary judgment asserts that plaintiff has failed to establish a prima facie case for the pregnancy discrimination claim.  (See

_____

[2] It is understandable that defendant BC/BS briefed this court on the issue of race discrimination, since plaintiff clearly testified in her deposition that she was making both a race and a pregnancy discrimination claim.  (See Dep. of Anderson 126.)

[3] "Mrs. Anderson only has one claim of discrimination in this case.  Mrs. Anderson has made a claim for discrimination based upon her pregnancy.  Mrs. Anderson is not making a claim of discrimination on the basis of her race."  (Pl.'s Response to Def.'s Motion for Summ. J. 4-5.)

Def.'s Mot. Summ. J.)

On December 15, 2003, the Defendant submitted evidence[4] in support of the motion and on December 22, 2003, defendant filed a supporting brief.  Plaintiff submitted evidence[5] in opposition to the motion for summary judgment on December 22, 2003, and filed a brief in opposition to the motion for summary judgment on January 5, 2004.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine

_____

[4] Defendant submitted the September 10, 2003 deposition of plaintiff Allison Amison Anderson with exhibits, the December 12, 2003 affidavit of Jeanae C. Freeman with exhibits, the December 12, 2003 affidavit of Larry Faulkner with exhibits, and the Plaintiff's original Complaint.

[5] Plaintiff submitted the May 13, 2003 deposition of Malesha Roberts, various documents produced by the Defendant, notes taken by the Plaintiff Allison Anderson, and pages from Allison Anderson's 2001 calendar.

issue of material fact.  See id. at 323.  Once the moving party
has met his burden, Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by his own affidavits, or by the
depositions, answers to interrogatories, and admissions on file,
designate specific facts showing that there is a genuine issue
for trial.  See id. at 324.

The substantive law will identify which facts are material
and which are irrelevant.  See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986).  All reasonable doubts about the facts
and all justifiable inferences are resolved in favor of the non-
movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115
(11th Cir. 1993).  A dispute is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving
party."  Anderson, 477 U.S. at 248.  If the evidence is merely
colorable, or is not significantly probative, summary judgment
may be granted.  See id. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears
the burden of proof on the issue at trial.  See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real
Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine

4

issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial.  See Fitzpatrick,
2 F.3d at 1115.  Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways.  First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating
that the non-moving party will be unable to prove its case at
trial.  Once the moving party satisfies its burden using this
method, the non-moving party must respond with positive evidence
sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not
bear the burden of proof at trial can satisfy its initial burden
on summary judgment is to affirmatively show the absence of
evidence in the record to support a judgment for the non-moving
party on the issue in question.  This method requires more than a
simple statement that the non-moving party cannot meet its burden
at trial but does not require evidence negating the non-movant's
claim; it simply requires the movant to point out to the district
court that there is an absence of evidence to support the non-
moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the
movant meets its initial burden by using this second method, the

5

non-moving party may either point out to the court record
evidence, overlooked or ignored by the movant, sufficient to
withstand a directed verdict, or the non-moving party may come
forward with additional evidence sufficient to withstand a
directed verdict motion at trial based on the alleged evidentiary
deficiency.  However, when responding, the non-movant can no
longer rest on mere allegations, but must set forth evidence of
specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996)
(citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561
(1992)).

### III. Relevant Undisputed Facts[6]

The Plaintiff, Allison Anderson, began working for BC/BS on
April 26, 1999 as a customer service representative.  (See Dep.
of Anderson 9.)  In the capacity of customer service
representative, the Plaintiff worked in the provider area,
answering incoming provider calls and answering questions related
to benefit information.  (See id. at 9-10.)  The chain of
supervisory authority over Anderson, in order of increasing
authority, was at all relevant times: Jeanae Freeman, Customer
Service Manager; Larry Faulkner, Call Center Manager; Tony
Carter, Operations Manager; and Jim Brown, Vice President over
Customer Service.  (See id. at 41; see also Def.'s Brief in

---

[6] If the facts are in dispute, they are stated in the manner
most favorable to the Plaintiff.  See Fitzpatrick, 2 F.3d at
1115.

6

Support of Summ. J. ¶ 12.)  The Plaintiff's team leader at all relevant times was Holly Cacciatore, who held no supervisory control over the Plaintiff, but was available to answer any questions that the Plaintiff might have.  (See Dep. of Anderson at 42.)

     Plaintiff Anderson testifies that pregnancy jokes were made at the office around the time of her hire to BC/BS, though none were directed at herself.  (See id. at 67.)  Sometime between 1999 and 2000, Anderson saw Todd Sproull (a Customer Service Manager) make a gesture at his stomach indicating a pregnant belly.  (See id. at 68.)  In explaining the situation, plaintiff testifies: "we had a stork that we would put on the person's desk when they told us that they were pregnant, and someone had the stork on their desk, and, you know, he kind of made a - one of those kind of bellies or something like that.  But again, he's a joker . . ." (Id.)  Plaintiff believes that she saw Sproull make the gesture one other time, though not directed at herself.  (See id. at 69.)  These are the only incidents the Plaintiff reports as possibly derogatory comments or gestures relating to pregnancy.  Well after these alleged events, on August 16, 2001, the Plaintiff reported to her Customer Service Manager, Jeanae Freeman, that she was pregnant.[7]  (See id. at 90.)

_____

     [7] Plaintiff testifies that she gave birth to her baby on May 1, 2002.  (See Dep. of Anderson 218.)  Apparently, the Plaintiff promptly reported her pregnancy to BC/BS.

Then, on August 22, 2001, Anderson was called to a meeting with her Team Leader, Cacciatore, and Freeman. (See id. at 15.) The purpose of this meeting was to review one of Anderson's customer calls with a dental provider, which resulted in a complaint by the provider regarding Anderson's conduct. (See id.) Specifically, Anderson's superiors felt that the Plaintiff had been "rude to a provider," as evidenced by the fact that Anderson "could have used a better tone of voice." (See id. at 15-6.) Plaintiff, both at the time of the meeting and currently, disagrees with this characterization and says tone of voice is "a matter of opinion. They don't have any set standards of how you answer the phone." (Id. at 19-10.) The meeting ended with the Plaintiff apologizing "even though [her] point of view was different from [Cacciatore's and Freeman's]." (Id. at 22-3.)

Nevertheless, in October of 2001, the Plaintiff was promoted to the position of customer service associate, a position which she had sought. (See id. at 10.) As a new customer service associate, Anderson's duties were similar to those performed as customer service representative - answering phone calls from the providers and passing along to them benefit information. (See id. at 11.) In fact, the only difference between the representative position and the associate position was the rate of pay. (See id.)

Despite her promotion to customer service associate, the

8

Plaintiff continued to have problems with complaints from providers she had spoken with on the phone.  (See id. at 25-8; Def.'s Ex. 1.)  The Plaintiff was again informed by her supervisors that she was rude while handling phone calls from providers on October 17, 2001 and on October 23, 2001.  (See id.)

At a special meeting called on October 29, 2001, Anderson was informed that she was in jeopardy of being fired for rudeness.  (See id. at 25-8.)  Freeman played back tape recordings of the allegedly rude calls to the Plaintiff during the course of this meeting.  (See id. at 29; 77.)  In response, the Plaintiff "told [Freeman] that [she] was pregnant, and [Freeman] said she knew it and it was out of her hands, and that was it."[8]  (Id. at 29.)

Later that day, Anderson met with Reginald Reed and Larry Faulkner (Call Center Manager) to discuss the allegedly rude phone calls.  (See id. at 30.)  In this meeting the parties talked about Anderson's employment record and the fact that Anderson's conduct on the phone with providers was rude.  (See id. at 32-4.)  In response, the Plaintiff told Reed and Faulkner that she was pregnant and that she didn't think that she was rude during the phone calls in question.  (See id. at 35.)  Both Reed

---

[8] Apparently, the Plaintiff reminded Freeman of her pregnancy as a possible reason why she had been rude during provider phone calls.  "At that time I advised her it could be part of the changes that take place in an expectant mother's body.  Mood swings are usual in expectant mothers."  (Id. at 90.)

and Faulkner responded that they didn't know that Anderson was pregnant.  (See id. at 34-5.)  Reed expressed disbelief that Anderson did not believe that she had been rude in the course of the phone calls in question.  (See id. at 34.)  Faulkner then advised Anderson that she would be terminated the following day if she did not voluntarily resign.  (See id. at 44-5; 49.)

On October 30, 2001, the Plaintiff, at her own request, met with the Human Resource Specialist of BC/BS, Pat Giles.  (See id. at 40.)  In the course of the hour and ten minute meeting, Anderson informed Giles of her pregnancy and imminent termination.  (See id. at 44.)  Anderson suggested to Giles that her pregnancy could be the reason for her poor customer service in recent months.[9]  (See id. at 48.)

On October 31, 2001, Mrs. Anderson was terminated from her position at BC/BS by Giles, on the recommendation of Freeman and Faulkner.  (See id. at 13; see also Affidavit of Jeanae C. Freeman ¶ 14.)  According to the Plaintiff herself, she was terminated in accordance with Offense 19 of the Blue Cross Rules of Conduct ("the Rules"), that offense being considered by BC/BS

---

[9] "Pregnant, hormones are saying and hearing things that are really not meant for destruction or anything, just may have been a bad day.  I have never been pregnant before so I don't know what could happen.  Emotions are a big part of it.  Had no idea that was that way."  (Id.)

to be intolerable.[10]   (See Dep. of Anderson 127.)  While the
Plaintiff asserts that she would have to go to the Rules to
figure out what action BC/BS was authorized to take on a first
offense (see Dep. of Anderson 131), the Rules themselves state
that while termination is not automatically required for an
intolerable offense, "the first commission of an intolerable
offense is sufficient cause for immediate termination" (see
Freeman Aff. ¶¶ 6,9).  Further, the Rules themselves state that
"since intolerable offenses are grounds for immediate dismissal,
they do not require progressive discipline steps.  (Id. at ¶ 10.)

On the same date as Anderson's termination, Giles told
Anderson how to file a grievance pursuant to BC/BS's grievance
procedure for non-exempt employees.[11]   (See Dep. of Anderson 85.)
Plaintiff in fact used this grievance procedure to oppose her
termination.  (See Def.'s Ex. 3.)  On November 7, 2001, the
Plaintiff filed a grievance report which stated Anderson's
concern to be that she was seventeen weeks pregnant at the time
of her dismissal;[12] her grievance form also expresses concern

---

[10] Offense 19, as stated in the Rules of Conduct, prohibits
"[g]ross disrespect, rudeness, or use fo abusive or vulgar
language to a customer, associate, vendor, or provider, whether
in person, by telephone, or through a correspondence."  (Freeman
Aff. ¶ 7.)

[11] BC/BS has a corporate grievance procedure for its non-
exempt employees.  (See Def.'s Ex. 3.)

[12] Plaintiff was dismissed from employment at BC/BS
approximately eleven weeks after she allegedly reported to her

over some racially derogatory comments made by a provider.[13]
(See id.)  Plaintiff's grievance was denied at Step 1 and Step 2.
(See Dep. of Anderson 100, 109-110.)  She did not appeal her
termination to the third step.  (See id. at 110.)

Anderson alleges that her termination from BC/BS was
discriminatory because the decision to terminate her was based on
her pregnancy status.  (See id. at 13-4.)  The Plaintiff bases
this allegation on BC/BS's failure to terminate alleged
comparators for purportedly similar conduct.  (See Pl.'s Response
to Def.'s Motion for Summ. J. ¶¶ 2; 4-9.)  Specifically, the
Plaintiff assumes that the following employees were accused of
violating Offense 19, but were not terminated: Cindy Brown,
Marietta Evans, Leahtrice Madison, Rhonda Nicholson, and Annie
Varesi-Ryan.  (See Dep. of Anderson 131; 134-35.)  However, the
Plaintiff capitulates that she did not know "for sure on anybody
but Rhonda Nicholson," because Nicholson had told the Plaintiff
that she had been "written up" for being rude.  (See id. at 137.)

### IV. Applicable Substantive Law and Analysis

**A.   The Pregnancy Discrimination Claim**

Count I of Anderson's complaint alleges that she was
subjected to discrimination by employer BC/BS because of her

---

employer that she was pregnant.

[13] See discussion *supra* Section I. for an explanation on why
the race discrimination charge is not herein discussed in more
detail.

12

pregnancy.[14]  Title VII of the Civil Rights Act provides that an
employer shall not "discriminate against any individual with
respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion,
*sex*, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1) (1994)
(emphasis added).   In 1978, Congress amended Title VII by
enacting the Pregnancy Discrimination Act ("PDA"),[15] which
provides, in relevant part:

> The terms "because of sex" or "on the basis of sex" include,
> but are not limited to, because of or on the basis of
> pregnancy, childbirth, or related medical conditions; and
> women affected by pregnancy, childbirth, or related medical
> conditions shall be treated the same for all employment-
> related purposes . . . as other persons not so affected but
> similar in their ability or inability to work.
> 42 U.S.C. § 2000e(k).

Rather than introducing new substantive provisions protecting the
rights of pregnant women, the PDA brought discrimination on the
basis of pregnancy within the ambit of the existing statutory
framework prohibiting sex-based discrimination.   Thus, the
analysis required for a pregnancy discrimination claim is the
same type of analysis used in other Title VII sex discrimination

---

[14] Paragraph 18 of the Plaintiff's complaint alleges that
BC/BS intentionally discriminated against Plaintiff in violation
of Title VII by "disparaging treatment and disciplining and
terminating her, because she was pregnant."  (Compl. ¶ 18.)

[15] In enacting the PDA in 1978, Congress acted to overrule
the Supreme Court's decision in <u>General Elec. Co. v. Gilbert</u>, 429
U.S. 125 (1976), which agreed with a holding that an exclusion of
pregnancy from a disability-benefits plan providing general
coverage is not gender-based discrimination.

suits.  See Armindo v. Padlocker, Inc., 209 F.3d 1319, 1320 (11th

Cir. 2000).  A plaintiff asserting a claim for discrimination on

the basis of pregnancy must establish a *prima facie* case in one

of the following ways: (1) by meeting the four-pronged test set

out for Title VII cases in McDonnell Douglas Corp. v. Green, 411

U.S. 792 (1973); (2) by direct evidence[16] of discriminatory

intent; or (3) by the use of statistical proof.  See Armstrong v.

Flowers Hosp., Inc., 33 F.3d 1308, 1313-14 (11th Cir. 1994).

   1.  **The Plaintiff's Failure to Make a *Prima Facie* Case**

   Because plaintiff did not submit direct evidence of

discriminatory intent[17] or statistical evidence, she must put

---

   [16] "Direct evidence of discrimination is evidence which, if
believed, would prove the existence of a fact [in issue] without
inference or presumption."  Bass v. Bd. of County Comm'rs, Orange
County, 256 F.3d 1095, 1105 (11th Cir. 2001) (internal quotations
omitted.)

   [17] Plaintiff's response to defendant's motion for summary
judgment displays no direct evidence, and articulates only the
McDonnell Douglas framework used in considering circumstantial
evidence.  (See Pl.'s Response to Def.'s Motion for Summ. J. 5.)
Further, Todd Sproull's alleged gesture at his stomach indicating
a pregnant belly (the closest possible direct evidence of
pregnancy discrimination) does not meet the definition of direct
evidence of discrimination.  See Bass, 256 F.3d at 1105.  Not
only was this gesture not related to the Plaintiff's termination,
it was not made by a decision-maker in this case, nor was it near
enough in time to be considered direct evidence.  See id., citing
Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir.
1996) (noting that "for statements of discriminatory intent to
constitute direct evidence of discrimination, they must be made
by a person involved in the challenged decision"); see also Scott
v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1228 (11th Cir.
2002) (ruling that a statement was not direct evidence because
"it was made approximately two and one-half years before the
termination.").

14

forth evidence tending to show that: (1) plaintiff is a member of the protected class; (2) plaintiff was subject to an adverse employment action; (3) the employer treated similarly situated employees outside of the protected class more favorably; and (4) plaintiff was qualified to do the job.  See Scott, 295 F.3d at 1228.

Both parties agree that the first two elements of plaintiff's *prima facie* case are satisfied.  As to the third element – whether employees are similarly situated for purposes of establishing a *prima facie* case – this court must consider whether or not the Plaintiff has met her burden[18] of showing that the comparators were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." Maynard v. Bd. of Regents, 342 F.3d 1235, 1259 (11th Cir. 2003) (citing Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir. 1998)).  The quality and quantity of the comparator's misconduct must be "nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges."  Maniccia, 171 F.3d at 1368.

Plaintiff Anderson fails to meet the burden of showing that those engaged in similar conduct to her own were treated differently than herself.  As noted earlier, plaintiff was

---

[18] See Smith v. Stratus Computer, Inc., 40 F.3d 11, 16-7 (1st Cir. 1994) for the contention that the Plaintiff bears the burden of showing that she was treated differently from similarly situated comparators in a disparate treatment case.  That is, the burden is not on the employer to show that the position of the alleged comparator is in fact dissimilar.  See also Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999).

terminated for violating a BC/BS Rule of Conduct, specifically Offense 19.  However, the Plaintiff cannot definitively recall anyone at BC/BS who violated Rule 19 and had no disciplinary action taken against them (see Dep. of Anderson 142) except for Rhonda Nicholson (see id. at 139).  She nevertheless identifies five employees that she *believes* were accused of violating Offense 19, but were not terminated, and uses these individuals as her comparators.  (See id. at 131; 134-35.)

The facts fail to substantiate plaintiff's unfounded belief that several of her alleged comparators were accused of violating Offense 19.[19]  Two of plaintiff's alleged comparators, Leahtrice Madison and Annie Varesi-Ryan, can immediately be dismissed from consideration here because they had never been cited for a violation any of the BC/BS Rules of Conduct; plaintiff is simply incorrect in stating that they had violated Offense 19.  (See Affidavit of Larry Faulkner ¶ 19.)  In fact, plaintiff's response to the motion for summary judgment does not list these two individuals as potential comparators for the alleged discriminatory act by BC/BS.  (See Pl.'s Response to Def.'s Motion for Summ. J. 5-6.)  Perhaps the Plaintiff recognizes that

---

[19] The Plaintiff often states her evidence for discrimination in the form of subjective belief, unsupported by actual verified fact.  No reasonable jury could hold in favor of the Plaintiff based on the Plaintiff's beliefs that are demonstrably untrue.  See Ben-Kotel v. Howard Univ., 319 F.3d 532, 535-36 (D.C. Cir. 2003) (observing that a witness' mistaken thought concerning a factual dispute in the face of overwhelming documentary evidence indicating to the contrary); see also FED R. EVID. 602 (stating that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter").

they are not viable comparators.  Regardless, there is no need for this court to consider the acts and potential comparison of Madison and Varesi-Ryan with plaintiff Anderson since they at no time violated or were accused of violating Offense 19.

Plaintiff's next attempt at finding a comparator also fails. She cites in her deposition Cindy Brown as a potential comparator, asserting that Brown was disciplined for a Rule 19 offense.[20]  (See Dep. of Anderson 134.)  In considering Brown as a possible comparator, the court notes that the Plaintiff was mistaken in her belief that Brown had been cited for an Offense 19 violation.[21]  In fact, Ms. Brown received a written warning for violating Offense 1, which consists of failure to achieve or maintain an expected standard of performance.  (See Faulkner Aff. ¶ 21.)  This conduct is different from Offense 19 conduct because unlike Offense 19 conduct, Offense 1 conduct is not aimed directly at a customer or provider.  (See id. at ¶ 38.) Partially for this reason, Offense 19 is considered an intolerable offense, while Offense 1 is not similarly considered an intolerable offense.  (See id.)  Also, while the Plaintiff's termination followed a previous counseling by management on the same issue, Ms. Brown's violation of Offense 1 was a single offense which did not follow any previous counseling.  (See id.)

---

[20] However, plaintiff's brief in opposition to summary judgment does not specifically state Brown as a viable comparator.  (See Pl.'s Response to Def.'s Motion for Summ. J. 5-6.)  Plaintiff may have realized after testifying at her deposition that Brown is not a viable comparator.

[21] See discussion supra note 19.

For all of these reasons, the court declines to assert that Brown and Anderson were similarly situated employees for purposes of this litigation.  Anderson and Brown were not involved in the same or similar conduct, nor were they disciplined in different ways for the same conduct.  See Maynard, 342 F.3d at 1259. Comparing Anderson and Brown would be equivalent to comparing apples and oranges, which this court refuses to do.  See Maniccia, 171 F.3d at 1368.

Plaintiff next relies on a comparison between herself and Marietta Evans as evidence that women who were not pregnant were treated more favorably than herself.  Plaintiff Anderson contends that "Ms. Evans was argumentative, short-tempered, and interruptive on three phone calls, yet she was not even written up for a violation of Rule 19, but Rule 2."  (Pl.'s Response to Def.'s Motion for Summ. J. 5.)  Plaintiff offers no evidence supporting this statement, other than her own subjective belief.

Meanwhile, defendant BC/BS notes that Offense 2 is a violation which consists of failure to comply with instructions or established operating procedures.  (See Faulkner Aff. ¶ 27.) It is a general offense but is not considered an intolerable offense warranting immediate termination pursuant to the BC/BS Rules of Conduct.  (See id. at ¶ 28.)  Defendant BC/BS also notes that while Faulkner approved the recommendation to offer a written warning to Evans, the recommendation came by request of supervisor Karen Hazelwood, Evans' supervisor at the time of the offense.  (See id. at ¶ 32.)  Anderson's supervisor, Jeanae

Freeman, played no role in the discipline of Ms. Evans.  (See id.)  This was Evans' first written warning, and she had not been verbally counseled prior to the warning.  (See id. at ¶ 39.)

For these reasons, the court declines to use Evans as plaintiff's comparator.  Evans' punishment was the result of her supervisor's recommendation, while Anderson's punishment was the result of her own, different supervisor's recommendation.  Having not been charged with the same offense, the two are not "nearly identical" for purposes of making a Title VII comparison.  See Maniccia, 171 F.3d at 1368.

Plaintiff's final allegedly similarly-situated comparator is Rhonda Nicholson.  (See Pl.'s Response to Def.'s Motion for Summ. J. 5.)  The Plaintiff contends that "Nicholson was short and sarcastic with a provider during a phone call and then hung up on the provider, yet she was only written up for violation of Rule 19."  (See id.)  Plaintiff's assertion that Nicholson received a written warning for violating Offense 19 is supported by verified evidence.  (See Faulkner Aff. ¶ 33.)  However, the differences between the situation of Anderson with the situation of Nicholson are readily apparent to this court.  Ms. Nicholson was supervised by Matthew Gwin and at no time was supervised by the Plaintiff's supervisor, Jeanae Freeman.  (See id. at ¶ 37.)  Nicholson was found to be rude to a customer only once, while the Plaintiff was verbally counseled in August 2001 for rudeness to a customer and then was rude again to two customers in October 2001.  (See id. at ¶ 40.)  Ms. Nicholson's written warning for an Offense 19

violation did not follow any prior counseling.  (See id.)  In fact, Mr. Faulkner testified that he has never approved of a punishment less than termination for a Customer Service Employee who violated Offense 19 after being subjected to corrective counseling for similar conduct.  (See id. at ¶ 41.)

Based on these facts, the Plaintiff has failed to show this court that the misconduct of Anderson was "nearly identical" to the misconduct of her alleged similarly-situated comparators.[22] Therefore, Anderson fails in establishing a prima facie case and summary judgment is due to be granted. See Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000) (holding that summary judgment is appropriate where a plaintiff fails to show that he is "similarly situated to any other employee"); see also Jones, 151 F.3d at 1324 (stating that "because we conclude that plaintiff 'failed to present a prima facie case of discrimination, [we] need not examine [defendant's] articulated reasons for discharging [her], nor determine whether [those] reasons were merely a pretext for discrimination . . .'").

## 2.  Defendant's Legitimate, Nondiscriminatory Reasons For the Dismissal of the Plaintiff and the Plaintiff's Failure to Establish Pretext

Even if this court is in error and the Plaintiff has made a prima facie case of pregnancy discrimination, BC/BS nevertheless prevails in the motion for summary judgment because BC/BS has articulated a legitimate, non-discriminatory reason for the

---

[22] Misconduct must be "nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges."  Maniccia, 171 F.3d at 1368.

dismissal of Anderson which the Plaintiff has failed to show as pretextual.[23]  There is no dispute between the parties that the Plaintiff was counseled on the subject of her rude behavior on the phone and that she was cited for violating Offense 19 of the BC/BS Rules of Conduct.  (<u>See</u> Faulkner Aff. ¶ 6; <u>see also</u> Dep. of Anderson 127.)  The BC/BS Rules of Conduct clearly state that a Rule 19 offense is "grounds for immediate dismissal and as such do not involve progressive discipline steps.  They are reviewed by each level of management in the employee's division prior to termination."  (<u>See</u> Def.'s Ex. c.1. at 13.)  Clearly then, BC/BS has articulated a legitimate, non-discriminatory reason for terminating Anderson.  <u>See</u> <u>LeBlanc v. TJX Co., Inc.</u>, 214 F. Supp. 2d 1319 (S.D. Fla. 2002) (holding that two customer complaints of plaintiff's rudeness constitute a legitimate, nondiscriminatory explanation for termination); <u>see also</u> <u>Robertson v. Home Depot (U.S.A.), Inc.</u>, 976 F. Supp. 1467, 1474 (S.D. Ala. 1997) (stating that "courts have held that these legitimate, non-discriminatory reasons may be . . . violation of work rules . . .").

Therefore, the burden at trial will require Anderson to show that the legitimate, non-discriminatory reason offered by BC/BS for Anderson's termination was merely a pretext for discrimination on the basis of Anderson's pregnancy.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802-03.  The Plaintiff must

---

[23] To satisfy this intermediate burden, "the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254-55 (1981).

exhibit that BC/BS acted with the intent to illegally discriminate on the basis of pregnancy.  See Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000).  To succeed in this task, the Plaintiff may "either directly . . . persuad[e] the court that the discriminatory reason more likely motivated the employer or indirectly . . . show that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256. Practically to withstand summary judgment, this means that the Plaintiff may discredit the employer's proffered legitimate, non-discriminatory reason by coming forward with admissible evidence from which a jury could conclude: (1) that the proffered reason had no basis in fact; (2) that the proffered reason did not actually motivate the employment decision; or (3) that the proffered reasons were insufficient to motivate the employment decision.  See Robertson, 976 F. Supp. at 1475, citing Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, concurring).

Plaintiff Anderson's deposition and attached evidence are ineffectual to show that BC/BS terminated plaintiff, a repeat Rule 19 offender, as a pretext for discriminating against her as a pregnant employee.  While Anderson does in fact name other employees whom she believes violated Rule 19 and were not terminated, the evidence bears out that only one of her comparators actually violated Rule 19.  Further, the evidence bears out that this one individual was not a repeat offender. Where the employer produces "performance reviews and other

documentary evidence of misconduct and insubordination that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997).  This is not to mention the fact that the Plaintiff has in fact testified that she attended meetings with her supervisors discussing her conduct with providers over the telephone, received a Discipline Report noting her termination for violating Rule 19, and utilized the grievance procedure provided by BC/BS.  (See Dep. of Anderson 15-34; 85; 109-110; 127.)

Plaintiff responds to these facts by arguing that she was not rude on the telephone with providers, but only "straightforward," and therefore did not violate Offense 19. Courts have made clear that such an assertion, however, is insufficient to meet the burden of showing pretext.  For example, in Webb v. R&B Holding Co., 992 F. Supp. 1382, 1387 (S.D. Fla. 1998), the plaintiff argued that "such complaints should not have been a basis for her termination because she had, in fact, not been rude to her customers . . .".  The court rejected this argument, holding that an employee's perception of him or herself is not a relevant analysis to undertake; rather, "it is the perception of the relevant decision-maker which is relevant." Id., citing Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980).

Moreover, even if this court agreed with the Plaintiff that her behavior was not rude, Title VII does not give this court the power to substitute its own business judgment for that of BC/BS.

See Alphin v. Sears, Roebuck, and Co., 940 F.2d 1497, 1501 (11th Cir. 1991) (stating that "this court does not sit as a super-personnel department that re-examines an entity's business decisions"). Given the provider complaints and tape-recorded phone calls, BC/BS could have reasonably concluded that Anderson was rude, thus violating intolerable Offense 19. It is in fact undisputed that Jeanae Freeman and Larry Faulkner, the two decision-makers in this case, concluded after an investigation that Anderson had violated Offense 19 and should be terminated as a result. (See Freeman Aff. ¶ 11, 14; see also Faulkner Aff. ¶ 11, 14.) The fact that Anderson believed she did not deserve to be terminated does not make BC/BS's reason for terminating her pretextual.

Because plaintiff has failed to put forth a *prima facie* case of comparators and has failed to show defendant's stated legitimate, non-discriminatory reason for the termination to be pretextual, defendant's motion for summary judgment is due to be granted.

## B. Plaintiff is Not Entitled to Preferential Treatment

Plaintiff testifies in her deposition that she informed Pam Giles, the Human Resource Specialist, that she may have been rude to providers on the telephone as a result of her pregnancy because "[e]motions are a big part of it." (Dep. of Anderson 48.) This court notes that the Plaintiff is not entitled to any preferential treatment based on her pregnancy status. Quite clearly, the PDA "does not require favorable treatment" for

pregnant women.  <u>Padlocker</u>, 209 F.3d 1319, 1321 (11th Cir. 2000);
<u>see</u> <u>also</u> <u>Spivey v. Beverly Enter., Inc.</u>, 196 F.3d 1309, 1312-13
(11th Cir. 1999) (holding that an employer did not violate the
PDA by offering modified duty solely to employees injured on the
job and not to employees with non-occupational injuries,
including pregnant employees).  Therefore, BC/BS was not required
to tolerate Anderson's rudeness to providers on the telephone
simply because she was pregnant and emotions run high during
pregnancy.  As such, Anderson was treated exactly as if she had
not been pregnant, and therefore was legally terminated for
violating Offense 19 of the BC/BS Rules of Conduct.

In summary, the court finds that no material issues of fact
remain and that defendant Blue Cross and Blue Shield of Alabama
is entitled to judgment as a matter of law as to the claim
asserted by plaintiff.  A separate order will be entered.

DONE this ___3___ day of March, 2004.

_____
SENIOR UNITED STATES DISTRICT JUDGE